**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, and                    :    Case No.
the States of CALIFORNIA                         :
and NEW JERSEY;                                  :    **COMPLAINT**
                                                 :
              Plaintiffs,                        :    **Jury Trial Demanded**
                                                 :
          *ex rel.*                              :    **Filed Under Seal Pursuant to**
                                                 :    **31 U.S.C. § 3730(b)(2)**
JEFFREY CACIOPPO                                 :
1680 Industrial Pkwy                             :
Brunswick, OH 44212                              :
                                                 :
              Relator,                           :
                                                 :
              v.                                 :
                                                 :
RPM INTERNATIONAL, INC.,                         :
2628 Pearl Road                                  :
Medina, OH 44256                                 :
                                                 :
          and                                    :
                                                 :
TREMCO, INC.                                     :
3735 Green Road                                  :
Beachwood, OH 44122                              :
                                                 :
          and                                    :
                                                 :
WEATHERPROOFING TECHNOLOGIES, INC.               :
3735 Green Road                                  :
Beachwood, OH 44122                              :
                                                 :
                                                 :
              Defendants.                        :
_____          :

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................ 1

II.    JURISDICTION AND VENUE ........................................... 3

III.   PARTIES ............................................................. 4

IV.    FACTUAL ALLEGATIONS .............................................. 5

      A.     Tremco/WTI's State and Federal Government Contracts ................ 5

      B.     Tremco and WTI Falsely Billed the Federal Government and State and Local Governments for Unnecessary Labor and Services that it Never Provided .................................................... 7

           1.     Extra and unnecessary consulting services ...................... 8

           2.     Extra and unnecessary inspection services ...................... 9

           3.     Extra and unnecessary warranties ........................... 10
                a.     QA Basic Warranty and TremCare Warranty ........... 10
                b.     Tremco Total Performance Warranty: TPW ............. 11

           4.     Extra and unnecessary heavy equipment ...................... 12

           5.     Inflated labor charges ..................................... 12

           6.     Tremco/WTI's unnecessary charges were false claims for payment .................................................. 13

      C.     The GSA Federal Supply Schedule and State Pricing Requirements ...... 14

      D.     Tremco's Failure to Provide Accurate Pricing Information to the Federal Government ................................................... 16

      E.     Tremco's Failure to Provide Federal and State Governments with Discounts Provided to Commercial Purchasers for Services and Equipment ........ 17

           1.     Inflating the total project cost ............................... 18

           2.     Inflating prices for services provided to the Government ......... 20
                a.     Inflated General Contracting Fees of up to 50% .......... 20

i

          b.      Roof Surveys: Free to Private Customers, Cost for
                  Federal Government ............................. 20
          c.      Line Item System Causes Government to Pay Higher
                  Prices ......................................... 20

    F.      Tremco/WTI's Misrepresentation of Services as Appropriate for the
          GSA Schedule ................................................. 22

**COUNT I**
**False Claims Act - Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)** ....................................................... 24

**COUNT II**
**False Claims Act - Making or Using False Records or Statements**
**to Cause Claim to be Paid**
**31 U.S.C. § 3729(a)(1)(B)** ....................................................... 24

**COUNT III**
**False Claims Act - Making or Using False Records or Statements to Conceal,**
**Avoid and Decrease Obligation to Repay Money**
**31 U.S.C. § 3729(a)(1)(G)** ...................................................... 25

**COUNT IV**
**False Claims Act - Conspiracy**
**31 U.S.C. § 3729(a)(1)(C)** ....................................................... 26

**COUNT V**
**CALIFORNIA FALSE CLAIMS ACT**
**Cal. Gov't Code § 12650,** *et seq.* .................................................. 27

**COUNT VI**
**NEW JERSEY FALSE CLAIMS ACT**
**N.J. Stat. Ann. § 2A:32C-1,** *et seq.* .............................................. 28

*Qui tam* Relator Jeffrey Cacioppo, through his undersigned attorneys and on behalf of the United States of America, brings this action against Defendants RPM International, Inc., Tremco, Inc., and Weatherproofing Technologies, Inc. (WTI) to recover damages and civil penalties arising from false or fraudulent statements, records and claims made or caused to be made by Defendants or their agents and employees to the United States Government ("the Government" or "the Federal Government") and state governments, including the following: California and New Jersey (collectively, "State Governments"). Defendants falsely billed the Government and State Governments for unnecessary labor and services that were not provided and inflated the prices of services that it did provide as compared to private customers. Defendants' actions violated the pricing requirements of their General Services Administration ("GSA") contracts and contracts with State Governments, as they charged these government customers more than private customers for the same or similar services. Defendants misrepresented many services as appropriate GSA Schedule services to avoid the stringent competitive bidding requirements for federal construction contracting.

On behalf of the United States of America and the State Governments of California and New Jersey, Relator alleges for his Complaint against Defendants as follows:

## I.   INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States Government and the State Governments arising from false statements, records and claims made and presented or caused to be made and presented by Defendants and their agents and employees in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and analogous provisions of State laws, including the following:

1

    a.      California False Claims Act, Cal. Gov't Code § 12650, *et seq.*;

    b.      New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*

(collectively, "State Statutes").

2.      The False Claims Act provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each such violation, plus three times the amount of the damages sustained by the Government. Liability attaches both to the acts of knowingly seeking unwarranted payment from the Government and knowingly creating or causing to be created false statements or records to conceal, avoid, or decrease an obligation to pay or transmit money to the Government. The False Claims Act provides that any person having information regarding a false or fraudulent claim against the Government may bring an action for himself and the Government and share in any recovery.

3.      Relator Jeffrey Cacioppo seeks to recover False Claims Act damages and civil penalties on behalf of the Government arising from Defendants' presentation of false claims, records, and statements to the Government and its agents in connection with Defendants' claims for payment for labor and services provided pursuant to Defendants' Government contracts, including with the GSA. Defendants knowingly violated the False Claims Act by the following acts, *inter alia*:

    a.      Falsely billing the Government for unnecessary labor and services that were never provided;

    b.      Offering more favorable pricing to private customers than to Government customers, despite best pricing representations to the Government; and

      c.     Misrepresenting their construction services as appropriate GSA Schedule services to avoid the stringent competitive bidding requirements for federal construction contracting.

4.     Defendants RPM, Tremco, and WTI violated the False Claims Act by engaging in these same illegal practices on projects that received funding from the Federal Government through the 2009 American Reinvestment and Recovery Act (ARRA).

5.     Relator Jeffrey Cacioppo seeks to recover damages and civil penalties arising under False Claims Act State Statutes from Defendants' presentation of false claims, records, and statements to the State Governments and their agents and employees in connection with Defendants' actions in selling unnecessary labor and services and labor and services at inflated prices to State Governments, in violation of their government contracts, including through contracts that adopt Association of Educational Purchasing Agencies (AEPA) pricing and terms.

## II.    JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3732 and 28 U.S.C. § 1367.  The False Claims Act, 31 U.S.C. § 3732, confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730 and for claims under state law.  28 U.S.C. § 1367 also confers jurisdiction on this Court for Plaintiffs' state-law claims.

7.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because Defendants transacted business in this District and committed acts proscribed by 31 U.S.C. § 3729 in this District.

8.      Venue is proper in the District of Columbia pursuant to 31 U.S.C. § 3732(a) because Defendants transacted business in this District and committed acts proscribed by 31 U.S.C. § 729 in this District.

9.      In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed under seal and will remain under seal for a period of at least sixty (60) days from its filing date and, where applicable under the State Statutes, for a longer period as specified by statute, and shall not be served upon the Defendants until after the Court so orders.

## III.    PARTIES

10.      Relator Jeffrey Cacioppo is a United States citizen and a resident of Ohio. He was an employee of Tremco, Inc. for 12 years. His last position at Tremco was Director of Business Development. After his Tremco employment, Mr. Cacioppo worked with a large roofing contractor that was a subcontractor for Tremco and WTI on large federal and state government projects. Mr. Cacioppo now operates his own registered engineering and consulting firm, which specializes in roofs and "building envelope" management, planning, and maintenance on industrial and commercial buildings. Relator Cacioppo bases the allegations in his complaint upon his inside experience working at Tremco and with RPM executives, his industry experience, and his experience with Defendants' contracting processes and roofing services after leaving Tremco.

11.      Defendant RPM International, Inc. ("RPM") is a multi-national publicly-traded holding company headquartered at 2628 Pearl Road, Medina, Ohio. Tremco is a wholly-owned subsidiary of RPM and is one of RPM's leading industrial companies. Defendant Tremco, Inc. ("Tremco") is an Ohio-based company located at 3735 Green Road, Beachwood, Ohio. Tremco provides roofing and weatherproofing services, including roofing restoration and repair. Tremco

4

is also a major manufacturer and supplier of roofing materials. Tremco has a comprehensive federal government program and provides goods and services to the Government. Tremco has provided goods and services to the Government through GSA Federal Supply Schedules for many years, including through its most recent GSA Schedule Contract that ended in April 2015.

12.     Defendant Weatherproofing Technologies, Inc. (WTI) is a certified general contractor that provides a wide range of roofing services and is headquartered at 3735 Green Road, Beachwood, Ohio. WTI is a wholly-owned Tremco subsidiary.

## IV.     FACTUAL ALLEGATIONS

### A.     Tremco/WTI's State and Federal Government Contracts

13.     Tremco/WTI participated in the GSA Federal Supply Schedule government program linking federal agencies with non-governmental entities to provide the Federal Government with the "best value" when it purchases goods and services that are also routinely sold to private customers. In order to ensure that the Government is not overcharged, the GSA negotiates Federal Supply Schedule contracts and other contracts with suppliers of commercial products and services, such as Tremco.

14.     Tremco and WTI provide roofing products and services to State and Local Governments through arrangements with the Association of Educational Purchasing Agencies (AEPA). AEPA is a cooperative of public schools, school boards, and educational service agencies and political subdivisions that establishes a universal operating contract for roofing as well as other products and services for its member states. Public schools, school boards, and educational service agencies and political subdivisions in California and New Jersey are AEPA members. As AEPA members, these State and Local Government customers enter into an

agreement with the AEPA that allows the AEPA to procure contracts for particular products and services on behalf of the State and Local Government entities. The State and Local Government customers can then order products and services from AEPA vendors, including Tremco/WTI, under the terms and conditions procured by the AEPA. The terms and conditions of AEPA's universal operating contract are incorporated into the State and Local Government customers' contracts with the AEPA vendors.

15.     Tremco/WTI's federal contracts are subject to the Federal Acquisition Regulations' ("FAR") requirement that there be full and open competition in the Government's purchases of commercial products and services.  48 C.F.R. § 6.101.  Likewise, all of Tremco/WTI's contracts with the Government, whether through the GSA Federal Supply Schedule or otherwise, are subject to the requirements of full and open competition.  41 U.S.C. § 3301.  GSA Schedule contracting procedures are "competitive" if "orders and contracts under those procedures result in the lowest overall cost alternative to meet the needs of the Federal Government." 41 U.S.C. § 152.

16.     Categories of commercial products and services offered under Federal Supply Schedule contracts are assigned Special Item Numbers ("SINs").  Pursuant to its GSA Supply Schedule for Buildings and Building Materials, Tremco/WTI sold roofing materials, products, and services (SIN 563-4), complete facilities maintenance (SIN 811-002), refrigeration, heating, ventilation and air conditioning HVAC maintenance (SIN 811-005), ancillary repairs and alterations (SIN 003-097), and warranties (SIN 563-99) to Government purchasers.

17.     Tremco/WTI has provided roofing services to numerous government agencies, including but not limited to: the National Institutes of Health; the Department of Energy; the United States Postal Service; the Navy; the Internal Revenue Service; the Federal Aviation

Administration; the Federal Bureau of Prisons; the Air Force; the Army; the Department of

Veterans Affairs; the Marine Corps; the Coast Guard; and the GSA.

18.     Tremco/WTI provided roofing materials and services to the Federal Government

and to State governments on buildings across the country.

**B.      Tremco and WTI Falsely Billed the Federal Government and State
         Governments for Unnecessary Labor and Services that it Never Provided**

19.     Tremco and WTI falsely billed Federal, State and Local government customers for

a variety of unnecessary and unused services.

20.     When Tremco/WTI's government customers had project budgets that were greater

than the estimated project cost, WTI added additional unnecessary, fabricated labor and service

charges to its cost proposal until the proposal amount was as close to the government's budgeted

number as possible.

21.     When the government did not have a stated budget, Tremco/WTI typically

proposed a budget that was large enough to include various padded expenses.

22.     Typically, the government agency adopted the Tremco/WTI inflated budget, not

knowing it was falsely inflated. When an agency voiced fiscal constraints, instead of reducing the

overall project cost, Tremco/WTI instead proposed a reduced project. This allowed Tremco/WTI

to still include unnecessary charges and preserve a substantial profit margin.

23.     As part of its mischarging scheme, Tremco/WTI charged governments for:

    a.      Extra, unnecessary, and ultimately unused consulting services;

    b..      Extra, unnecessary, and ultimately unused inspection services;

    c.      Extra and unnecessary warranties;

    d.      Extra, unnecessary, and ultimately unused heavy equipment; and

     e.     Labor services inappropriately and falsely charged for work performed for other projects or customers.

24.     WTI/Tremco management approved all estimates for extra and unnecessary charges. On information and belief, RPM was aware of the Tremco/WTI practices or, alternatively, should have known and later became aware and did not disclose or refund the overcharges to Federal, State and Local government customers.

25.     Relator witnessed Tremco/WTI adding unnecessary and inflated charges to government projects. Former Tremco President Deryl Kratzer admitted to Relator that extra and unnecessary consulting fees were added to government projects.

26.     By making claims for payment of services and labor that were not necessary, not provided nor intended to be provided, Defendants RPM, Tremco, and WTI presented or caused to be presented to the government false or fraudulent claims for payment or approval.

**1.     Extra and unnecessary consulting services**

27.     Tremco and WTI included consulting services that were not needed in their proposed purchase orders and ultimately charged government customers for consulting services that it never provided or intended to provide. Private customers were not similarly charged.

28.     Roof repair and replacement often requires some consulting services. The cost of these consulting services was incorporated into prices for products and services provided by Tremco/WTI through the GSA Schedule listings and the similar state purchasing agreement systems. Tremco and WTI, however, added additional charges for consulting services into the proposed purchase orders they submitted to Federal and State Government customers. As a result, Tremco and WTI double-charged or overcharged Federal and State Governments for consulting

8

services, because these services had already been included in the price of the products and services being purchased.

29.     Tremco and WTI provided sales representatives with a financial incentive to include falsely-inflated consulting charges by providing a 50% sales commission on all consulting fees paid.

## 2.     Extra and unnecessary inspection services

30.     Tremco/WTI charged government customers for extra, unnecessary inspection services that were not performed.

31.     Tremco/WTI's roofing projects included charges for inspection services in its cost proposals. Some inspection services were necessary for quality control purposes. Inspections ensured that contractors followed project specifications.

32.     The cost of Tremco/WTI's inspection services should have been calculated by multiplying the GSA Schedule price for inspectors by the number of inspectors needed and the number of days those inspectors were reasonably expected to work. Similar calculations were applicable to State Government projects.  Instead of accurately estimating days, Defendants made or caused to be made inflated calculations that were then passed on to government customers and did not refund monies for inspection work never performed.  Private customers were not overcharged in this way.

33.     Defendant WTI's sales and marketing management inflated the charges for inspection services by increasing the estimated number of inspection days beyond what was necessary or reasonable. As a result, WTI submitted higher cost proposals than was necessary to the Government and to State Governments.  Defendant WTI's misconduct was directed by

9

Tremco management and RPM knew or should have known of this fraudulent bidding by its wholly-owned subsidiaries.

### 3.   Extra and unnecessary warranties

34.   Tremco and WTI sold warranty products to government customers that they knew were not necessary, would not be used, and that they never intended to provide.

35.   Tremco has two warranties that it sells to both private and government customers, the Tremco QA Basic Warranty and the Tremco TremCare warranty, and one warranty which it only sells to Federal Government customers, the Tremco Total Performance Warranty (TPW).

### a.   QA Basic Warranty and TremCare Warranty

36.   The Tremco QA Basic Warranty typically covers some inspections in the second, fifth, and tenth year of a roof, depending on the warranty length. The Tremco QA Basic Warranty does not cover maintenance services.

37.   Tremco's TremCare warranty covers the same inspection services as the QA basic warranty, as well as additional inspection services and maintenance services.

38.   Tremco/WTI often sold both the Tremco QA Basic Warranty and the TremCare warranty to government customers, despite that TremCare alone already included all of the QA Basic Warranty's services. This resulted in government customers being billed for duplicative inspection services: once through payment for the basic warranty and again when purchasing TremCare.

39.   Tremco/WTI required government customers seeking to purchase a warranty that covered inspection and maintenance to purchase both the QA Basic Warranty and TremCare.

Tremco/WTI never disclosed to government customers that TremCare by itself was sufficient to cover the requested services.

40.     In most instances, the government did not even know that it purchased both a Quality Assurance warranty and a TremCare warranty. The warranty costs were merely included by Tremco/WTI in the overall price of a new roof.

41.     Tremco doubled-billed these warranty products to multiple State and Federal Government customers including the United States Postal Service, the National Institute of Health, the Department of Energy, all branches of the military, the Internal Revenue Service, the General Services Administration, the Federal Aviation Administration, the Federal Bureau of Prisons, and the Department of Veterans Affairs.

42.     On information and belief, RPM was aware that Tremco double-billed warranty products to the government, or, alternatively, should have known and later became aware and did not disclose or refund the overcharges to government customers.

**b.      Tremco Total Performance Warranty: TPW**

43.     The purported purpose of Tremco's Total Performance Warranty, known as TPW, is to shift the burden of replacing a roof that fails early from Federal Government customers to Tremco. If the roof fails during the negotiated TPW coverage period, Tremco is responsible for replacing the roof at Tremco's expense.

44.     Tremco's Total Performance Warranty was available on GSA Federal Supply Schedule 03FAC, Special Item Number (SIN) numbers: 811-002: Complete Facilities Maintenance, 811-005: Refrigeration, Heating, Ventilation, and Air Conditioning HVAC maintenance and 003-097: Ancillary Repairs and Alterations.

45.     Before selling the Total Performance Warranty to Government customers, Tremco performed exhaustive tests to ensure that there was no possibility of the roof failing during the life of the warranty. As a result, Tremco/WTI charged Government customers for a service that it knew the Government did not need, inflating the cost of the project.

46.     Tremco sold Total Performance Warranties to the United States Postal Service, the National Institutes of Health, the Army, and other agencies.

### 4.     Extra and unnecessary heavy equipment

47.     Tremco and WTI charged government customers for heavy equipment, even when they knew that the equipment in the quantities listed was not needed, would not be used, and was not used.  Tremco/WTI made no refunds for these unused services and equipment.

48.     Tremco/WTI commonly charged State and Federal Government customers for cranes that were not needed and were never used.  Cranes are expensive pieces of equipment to rent for a project and require highly-compensated operators.

### 5.     Inflated labor charges

49.     When, despite its inflated budget proposals, Tremco/WTI's actual project costs turned out to be higher than anticipated, Tremco and WTI fraudulently billed different Federal Government customers on separate and unrelated roofing projects for labor costs from the over-budget government projects.

50.     On information and belief, Tremco and WTI fraudulently billed State Government customers for labor costs from separate and unrelated over-budget government roofing projects.

51.     RPM required each Tremco/WTI project to be profitable, instead of accepting a smaller profit or a loss on over-budget projects.  As a result of RPM's unrealistic profitability

goals and under RPM's direction or control, Tremco and WTI engaged in their illegal practice of charging government customers for labor that was already paid for by different government customers through prior purchase orders.

52.     Tremco/WTI attempted to use this tactic of moving labor and related charges from one federal contract to another on a Tremco/WTI roofing project at the Portsmouth Naval Shipyard in Portsmouth, New Hampshire.  At the time, Relator Cacioppo was the General Manager of A.W. Farrell, the roofing contractor on the project.  A.W. Farrell was a subcontractor to Tremco/WTI on the Portsmouth project.  Because the project was behind schedule, the WTI Construction Manager ordered A.W. Farrell employees to work overtime on the weekends, resulting in extra A.W. Farrell overtime expenses exceeding $400,000.  The WTI Senior Construction Manager told Relator that A.W. Farrell's extra overtime expenses had to be paid from other government projects because RPM management was monitoring the profit of every project and did not want any project to be unprofitable.  Relator Cacioppo responded to WTI that A.W. Farrell could not be part of such a fraudulent cost-shifting scheme.

### 6.     Tremco/WTI's unnecessary charges were false claims for payment

53.     Tremco and WTI were aware that extra labor and services were unnecessary and were not provided.  When Relator discovered that government customers had been charged for consulting services that were not needed or provided, he met with Deryl Kartzer, then President of Tremco Roofing and Building Maintenance.  Mr. Kratzer informed Relator Cacioppo that he approved these extra charges and that he encouraged the sales representatives to add consulting to State and Federal Government contracts, including GSA contracts.  Mr. Kratzer told Relator that

adding extra consulting services helped Tremco and WTI reach the profitability goals set by RPM management.

54.     Tremco/WTI employees told Relator that Tremco President Kratzer required fabricated consulting to be added to State and Federal Government jobs.

55.     The government received no benefit from the additional labor and services for which it paid. The extra labor and services added to government projects were not genuinely needed and in virtually all cases were not actually provided to the government, nor were refunds made.

56.     By submitting proposals for payment to government customers as if all services included in Tremco/WTI's cost proposal were needed and would be provided, when in fact they had not been, Tremco/WTI knowingly submitted false, inaccurate invoices to the government for payment.

57.     As a result, Defendants RPM, Tremco, and WTI presented or caused to be presented to the government false or fraudulent claims for payment or approval for unnecessary labor and services that were never provided or intended to be provided.

58.     The government paid substantially more than it otherwise would have were it not for Defendants' false billing.

**C.     The GSA Federal Supply Schedule and State Pricing Requirements**

59.     Under GSA regulations, commercial suppliers' Federal Supply Schedules are to be based on established commercial prices which the Government uses to negotiate "most favored customer" pricing when compared to ordinary commercial transactions made under similar circumstances.  48 C.F.R. §§ 515.408, 538.270.  Once it is established that a manufacturer's or

vendor's products are offered to commercial purchasers in sufficient quantities to establish a market-tested commercial price, GSA's objective is to negotiate a pricing discount for Government purchasers below the vendor's established catalog or market prices.  48 C.F.R. § 538.270.

60.     Once GSA pricing is negotiated, the commercial supplier publishes a list or schedule of prices for products and services offered through the GSA program.  Federal agencies rely on these pricing schedules to make purchasing decisions without having to engage in the time-consuming and expensive process of independently determining whether a potential supplier is offering the purchasing agency fair and reasonable pricing.

61.     With respect to any and all of Tremco and WTI's responses to solicitations for bids for Government jobs, whether through its GSA contracts or otherwise, they were on notice that the Government purchaser considered the cost to the Government as an evaluation factor.  41 U.S.C. § 253a(c).

62.     In order for the Government to be able to negotiate meaningful terms with a prospective supplier, the supplier must provide the Government with information about how it actually prices its products for non-government purchasers.  48 C.F.R. § 515.408.

63.     The AEPA contract and State and Local Government contracts similarly require AEPA vendors to offer their products and services at discounted prices to AEPA State and Local Government members.  The AEPA contract requires vendors to provide it with "most favored customer pricing," that is, prices that are equal to or better than the prices the vendor charges other customers. Because the AEPA contract terms are then incorporated into the State and Local

Government contracts with the AEPA vendors, State and Local Government contracts also require

AEPA vendors to provide most favored customer pricing.

**D.      Tremco and WTI's Failure to Provide Accurate Pricing Information to the Federal Government**

64.      Tremco and WTI negotiated Federal Supply Schedule contract prices with Federal

Government agencies and entities based on prices that Tremco and its subsidiary WTI charged to

State and Local Government entities, including public schools, through its Association of

Educational Purchasing Agencies (AEPA) contract.

65.      Tremco/WTI's AEPA pricing was based on a line item system of bidding. Line

items are components of Tremco/WTI's roofing projects, such as roof system components,

roofing materials, adhesives, fasteners, felts, primer, and insulation sizes. Each component

includes a general contractor fee, a labor fee, and a material cost.  Tremco and WTI did not

disclose the cost of the amounts within each line item to its AEPA or Federal Government

customers.

66.      Tremco fraudulently represented to the Federal Government, as a participant in the

GSA program, that the line item prices were established commercial prices. However,

Tremco/WTI does not charge other private customers through the line item system. Instead,

Tremco and WTI charge private customers based on the more traditional process of separately

pricing materials, labor, and the general contractor fee. The more traditional process that Tremco

and WTI used with private customers almost always results in a lower cost to private customers

than the prices charged to government customers.

67.      By combining all expenses, rather than detailed bidding disclosing the various

charges, Tremco and WTI's line item contract inflated the price that Tremco/WTI charged the

Federal Government for each component and, ultimately, the overall price of Government roofing projects as compared to private customers with the same or similar needs. As a result, Tremco/WTI did not truthfully represent that it complied with the GSA "best price" pricing requirements and, in fact, it failed to do so. *See* 48 C.F.R. 538.270; 48 C.F.R. 15.402(a).

68.    Because private customers did not use the line item contract, the line item prices did not represent the actual commercial pricing structure for Tremco/WTI customers.

69.    Tremco's representations and certifications that its Federal Government pricing was based on the pricing it provided its commercial customers were made with actual knowledge of falsity, deliberate ignorance of the truth or falsity, or in reckless disregard of the truth or falsity. Tremco and WTI were aware that their private customers were not charged using the inflated line items system and that Government customers were. RPM, likewise, was well-aware of the wrongdoing and that the line item system resulted in higher profits for its subsidiary corporations, Tremco/WTI, than did traditional bidding and construction methods used with private customers.

70.    As a result, by certifying that the Federal Government customers received the "best price," Defendants presented or caused to be presented to the Government false claims for products and services purchased by the Government pursuant to the GSA's purchasing systems.

71.    The Federal Government paid substantially more than it would have were it not for Defendants' false representations that they fulfilled "best pricing" obligations under the GSA Schedules.

E.    **Tremco's Failure to Provide Federal and State Governments with Discounts Provided to Commercial Purchasers for Services and Equipment**

72.    In addition to the requirement that a supplier's GSA pricing be based on established catalog or market prices and then discounted pursuant to negotiations with the GSA,

17

the supplier must notify the Federal Government of reductions in the price charged to commercial customers. If a supplier reduces the price it charges its non-Government customers, it must report this reduction or discount and provide the same relative price reduction to the Government. 48 C.F.R. §§ 538.273(b)(2), 552.238-75.

73.     The AEPA contract also requires vendors to disclose and offer to the AEPA any price reductions that are given to other customers during the term or extension of the vendor's contract with the AEPA. By incorporating the terms of the AEPA contract into State and Local Government contracts with Tremco/WTI, State and Local Government contracts also required Tremco/WTI to disclose and offer price reductions to State and Local Government customers.

74.     Despite its obligations and representations that government customers were receiving the most favorable prices and terms, Tremco/WTI regularly provided its commercial customers with discounts greater than and pricing lower than those offered to government purchasers, without disclosing these price reductions on services and equipment to government customers.

### 1.     Inflating the total project cost

75.     Tremco and WTI charged government customers greater overall prices than they charged private customers for the same or similar roofing projects through their practice of including a variety of unnecessary and unused services in proposed purchased orders. This inflated the overall price of State and Federal Government roofing projects, as compared to Tremco/WTI's private customers' roofing projects.

76.     As directed by Tremco and, on information and belief, RPM, WTI added additional unnecessary, fabricated line items to bring the overall project cost as close to the

government's stated budget as possible. Tremco/WTI did this even if private customers paid a much lower price than the government's budgeted amount for the same or similar projects.

77. As a result of adding false and fraudulent line items into its bids for government customers, Tremco/WTI routinely provided lower prices to private customers without notifying government customers of these lower prices or providing government customers with the same discounts.

78. Defendants RPM, Tremco, and WTI presented or caused to be presented to the State and Federal Governments false claims for products and services purchased pursuant to Tremco's GSA contracts or GSA-negotiated pricing and Tremco/WTI's State and Local Government contracts.

79. RPM, Tremco, and WTI management were aware that the extra labor and services charged were unnecessary and were not provided. Deryl Kratzer, former President of Tremco Roofing and Building Maintenance, told Relator that he approved of extra and unnecessary consulting charges. Tremco/WTI employees told Relator that President Kratzer and RPM International, Inc. required fabricated consulting charges to be added to Federal Government jobs.

80. As a result, Tremco and WTI's representations and certifications that they were providing the government customers with discounts and the "best value" relative to commercial customers and that they would report and provide any additional discounts given to private customers were made with actual knowledge of falsity, deliberate ignorance of the truth or falsity, or in reckless disregard of the truth or falsity.

81.     State and Federal Government customers paid substantially more than they otherwise would have were it not for Tremco/WTI's intentionally false pricing misrepresentations.

### 2.     Inflating prices for services provided to the Government

82.     In addition to charging Federal and State Government customers for unnecessary services that were not needed or actually provided, Tremco/WTI inflated the prices charged to government customers for services that were provided.

### a.     Inflated General Contracting Fees of up to 50%

83.     At RPM's direction, Tremco/WTI charged government purchasers an inflated fee for its general contracting services, as compared to private customers.

84.     At the time Relator left Tremco, according to Tremco President Kratzer, Tremco/WTI charged a general contracting fee equal to 50% of the total project cost.  However, WTI and Tremco generally charged private customers a general contractor fee equal to 5% to 10% of the overall project. Relator Cacioppo knows from his extensive experience in the construction industry that a typical general contracting fee is 1% to 10%, with the general contractor rate decreasing as the project cost increases.

### b.     Roof Surveys: Free to Private Customers, Cost for Federal Government

85.     Tremco and WTI commonly provided customers with roof surveys. Roof surveys are an analysis of the existing roof and can be a simple process, such as a visual assessment by a sales representative, or can include more complex procedures, such as infrared analysis of the roof's performance.

86.     Tremco and WTI were more likely to charge Federal Government customers for roof surveys while providing these surveys free to private customers.

### c.     Line Item System Causes Federal and State Governments to Pay Higher Prices

87.     The Tremco/WTI line item system results in the government paying more than private customers for the same services. Tremco/WTI does not charge private customers through the line item system, but instead, separately prices materials, labor, and the general contractor fee. This typically results in a lower cost to private customers as compared to Federal and State Government customers with the same or similar needs.

88.     Through the inflated line item pricing, general contracting fees and roof survey fees, Tremco and WTI failed to provide the Federal Government with "most favored customer" pricing or "fair and reasonable" pricing. Tremco and WTI failed to disclose that private customers obtain cheaper services when using traditional contracting methodology, rather than the more expensive "Government-only" line item contract process. Tremco and WTI also failed to disclose that private customers often received roof surveys at no charge and paid lower general contracting fees. Tremco and WTI did not reduce the prices offered to the Federal Government to take into account the better prices offered to similarly situated private customers.

89.     Through the inflated general contracting fees and line item system, Tremco/WTI failed to offer discounts to State Governments and failed to reduce the prices offered to the State Government customers to take into account the better prices offered to similarly situated private customers, as required by their contracts with State and Local Government customers.

90.     As a result of its line item pricing system used with government customers, Defendants RPM, Tremco, and WTI presented or caused to be presented to the government false

claims for products and services purchased pursuant to Tremco's GSA contracts or GSA-negotiated pricing and Tremco/WTI's contracts with State and Local Government customers.

91.    Tremco/WTI's representations and certifications that it was providing the government customers with discounts or the "best value" relative to commercial customers and that it would report and provide any additional discounts given to private customers were made with Defendants' actual knowledge of falsity, deliberate ignorance of the truth or falsity, or in reckless disregard of the truth or falsity.

92.    Federal, State and Local Governments paid substantially more than they otherwise would have were it not for Tremco/WTI's intentionally false pricing misrepresentations.

**F.    Tremco/WTI's Misrepresentation of Services as Appropriate for the GSA Schedule**

93.    Relator has direct knowledge of Tremco/WTI's practice of misrepresenting their services as appropriate GSA Schedule services in order to avoid the stringent competitive bidding and accountability requirements for federal construction contracting.

94.    Construction services generally cannot be purchased through the GSA Schedule and GSA Advantage programs and, instead, must be competitively bid. 10 U.S.C. § 2305a; 41 U.S.C. § 3309; 48 C.F.R. § 36.103; 48 C.F.R. § 36.104.

95.    The Office of Federal Procurement Policy specified in a Memorandum that:

> ...Part 12 [regulating the GSA Schedule] should rarely, if ever, be used for new construction acquisitions or non-routine alteration and repair services...agencies should apply the policies of FAR Part 36 [regulating construction services] to these acquisitions...Part 12 generally may be suited for routine painting or carpeting, simple hanging of drywall...and other non-complex services, as well as for purchases of commercial construction material and associated ancillary services.

Memorandum, Applicability of FAR Part 12 to Construction Acquisitions (2003).

96.     Services offered under the GSA Schedule must be commercial items. 48 C.F.R. §
538.271.  Services are commercial items if they are installation, maintenance, repair, training or
other services "...procured for support of an item..." that is offered on the GSA Schedule where
"the source of such services provides similar services contemporaneously to the general public
under terms and conditions similar to those offered to the Federal Government." 41 C.F.R. §
2.101.

97.     However, the majority of the services work Tremco and WTI performed for the
Government were not commercial items, as its services were not "...procured for support of an
item..." that is offered on the GSA Schedule, nor were they provided "...to the general public
under terms and conditions similar to those offered to the Federal Government." 41 C.F.R. § 2.10.

98.     Most Tremco/WTI services provided under the GSA Schedule were roof
replacement and complex roof repair. When Tremco/WTI replaces Government roofs, such
services are not commercial items because roof replacement services are not provided "for the
support of" GSA Schedule products. Instead, GSA Schedule products are provided in support of
the roof replacement services. Additionally, Tremco/WTI's services were not provided to the
Government under similar terms and conditions, as private customers paid less for the same or
similar services. Complex roof repair services are likewise not commercial items, as they too are
not provided to support GSA Schedule products, nor are they provided under similar terms and
conditions as those provided to private customers. As a result, most of Tremco/WTI's services do
not satisfy GSA Schedule requirements.

99.     Tremco/WTI's GSA Schedule services were often construction services. Its
complex repair and roof replacement services are "construction, alteration or repair...of buildings,

23

structures or other real property." 48 C.F.R. § 2.101.  As a result, these services should have been competitively bid pursuant to FAR Part 36. See 48 C.F.R. § 36.103; 48 C.F.R. § 36.104.

100.    Tremco/WTI's submission of proposals to the Federal Government for complex construction projects that did not qualify as commercial items were made by Defendants with actual knowledge of falsity, deliberate ignorance of the truth or falsity, or in reckless disregard of the truth or falsity.

101.    As a result, Defendants submitted or caused to be submitted purchase orders that were false claims for payment.

## COUNT I
### False Claims Act - Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

102.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

103.    Through the acts described above and otherwise, Defendants and their agents and employees knowingly presented or caused to be presented to the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

104.    As a result of Defendants' conduct, the United States Government has been harmed by an amount to be determined at trial, and is also entitled to statutory penalties.

## COUNT II
### False Claims Act - Making or Using False Records or Statements
### to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

105.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

24

106.     Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B), in order to get false or fraudulent claims paid and approved by the United States Government.

107.     As a result of Defendants' conduct, the United States Government has been harmed by an amount to be determined at trial, and is also entitled to statutory penalties.

**COUNT III**
**False Claims Act - Making or Using False Records or Statements to Conceal,**
**Avoid and Decrease Obligation to Repay Money**
**31 U.S.C. § 3729(a)(1)(G)**

108.     The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

109.     Through the acts described above and otherwise, in violation of 31 U.S.C. § 3729(a)(1)(G), Defendants and their agents and employees knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, and decrease Defendants' obligation to repay money to the United States Government that Defendants improperly or fraudulently received.  Defendants also failed to disclose material facts that would have resulted in substantial repayments to the United States Government.

110.     As a result of Defendants' conduct, the United States Government has been harmed by an amount to be determined at trial, and is also entitled to statutory penalties.

**COUNT IV**
**False Claims Act - Conspiracy**
**31 U.S.C. § 3729(a)(1)(C)**

111.     The allegations of the preceding paragraphs are re-alleged as if fully set forth

below.

112.     Through the acts described above and otherwise, RPM, Tremco, and WTI entered

into a conspiracy or conspiracies to defraud the United States by getting false or fraudulent claims

allowed or paid in violation of 31 U.S.C. § 3729(a)(1)(C). RPM, Tremco, and WTI also conspired

to omit disclosing or to actively conceal facts which, if known, would have reduced Government

obligations to it or resulted in repayments from it to Government programs.

113.     RPM, Tremco, WTI and their agents and employees have taken substantial steps in

furtherance of those conspiracies, inter alia, by preparing false records, by submitting claims for

reimbursement to the Government for payment or approval, and by directing its agents and

personnel not to disclose and/or conceal its fraudulent practices.

114.     The United States, unaware of Defendants' conspiracy or the falsity of the records,

statements and claims made by Defendants, their agents and employees, and as a result thereof,

has been paid money that it would not otherwise have paid. Furthermore, because of Defendants'

and their agents' and employees' false records, statements, claims and omissions, the United

States has not recovered federal funds from the Defendant that otherwise would have been

recovered.

## COUNT V
## CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code § 12650, *et seq.*

115.   The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

116.   This is a civil action brought by Relator, on behalf of the State of California, against Defendants, pursuant to the California False Claims Act, Cal. Gov't Code § 12652(c).

117.   Defendants violated the California False Claims Act, by, *inter alia*, selling the State of California or its subdivisions unnecessary roofing labor and services that were never provided and inflating the prices of roofing services that were provided.

118.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge, knowingly and intentionally made or caused to be made, false records or statements to get false or fraudulent claims paid in violation of Cal. Gov't Code § 12651(a)(2).

119.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge, presented or caused to be presented to an officer or employee of the State of California or its political subdivisions false or fraudulent claims for payment in violation of Cal. Gov't Code § 12651(a)(1).

120.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge, knowingly or intentionally made or caused to be made, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

121.    The State of California, or its political subdivisions, unaware of the falsity of the claims or statements made by Defendants, and in reliance on the accuracy of these claims, paid for unnecessary roofing labor and services that were never provided and paid Defendants an excessive amount for roofing services.

122.    As a result of Defendants' actions, the State of California or its political subdivisions has been and continues to be severely damaged.

## COUNT VI
## NEW JERSEY FALSE CLAIMS ACT
### N.J. Stat. Ann. § 2A:32C-1, *et seq.*

123.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

124.    This is a civil action brought by Relator, on behalf of the State of New Jersey, against Defendants, pursuant to the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

125.    Defendants violated the New Jersey False Claims Act, by, *inter alia*, selling the State of New Jersey or its subdivisions unnecessary roofing labor and services that were never provided and inflating the prices of roofing services that were provided.

126.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of state funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

127.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

28

made, used, or caused to be made or used, false records or false statements to get false claims paid or approved, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

128.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

129.    The State of New Jersey,  or its political subdivisions, unaware of the falsity of the claims or statements made by Defendants, and in reliance on the accuracy of these claims,  paid for unnecessary roofing labor and services that were never provided and paid Defendants an excessive amount for roofing services.

130.    As a result of Defendants' actions, the State of New Jersey, or its political subdivisions, has been and continues to be severely damaged.

## REQUEST FOR RELIEF

WHEREFORE, Relator Jeffrey Cacioppo requests that judgment be entered against Defendants Tremco, Inc., WTI, Inc., and RPM International, Inc. ordering that:

1.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

2.    Defendants cease and desist from violating:

      a.    California False Claims Act, Cal. Gov't Code § 12650, *et seq.*;

      b.    New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1, *et seq.*

3.    The Court enter judgment against Defendants in an amount equal to three (3) times the amount of damages the United States Government and the States and their subdivisions have sustained as a result of Defendants' actions, as well as a civil penalty against each Defendant of at least $5,500 for each violation of 31 U.S.C. § 3729 and the State False Claims Act statutes;

4.    Relator be awarded the maximum amount allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d), and the State False Claims Act statutes;

5.    Relator be awarded all costs and expenses of this action, including attorneys' fees, pursuant to 31 U.S.C. § 3730(d) and any applicable State False Claims Act statutes;

6.    Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

7.    The United States, the States and their subdivisions and Relator recover all such other relief as the Court deems just and proper.

Respectfully submitted,


_Mark Hanna (LH)_

Mark Hanna (DC Bar No. 471960)
Lauren Hoff-Downing (Pro hac forthcoming)[1]
Murphy Anderson PLLC
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: 202-223-2620
Fax: 202-223-8651
*mhanna@murphypllc.com*
*lhoff@murphypllc.com*

---

[1] Admitted to practice in Pennsylvania. License to practice in the District of Columbia pending. Supervised by principals of the firm who are members of the District of Columbia Bar.

Ann Lugbill (DC Bar No. 462850)
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH  45219
Phone:  513-784-1280
Fax: 877-784-1449
        ****
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: 202-223-2620
Fax: 202-223-8651
*alugbill@murphypllc.com*

Phillip A. Ciano
Andy Goldwasser
Ciano & Goldwasser, LLP
1610 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115-1093
Phone: (216) 658-9900
Fax: (216) 658-9920
*asg@c-g-law.com*
*pac@c-g-law.com*

**Attorneys for Plaintiff-Relator Jeffrey Cacioppo**


**REQUEST FOR TRIAL BY JURY**

Relator hereby demands a trial by jury.

_____
Counsel for Relator

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of July 2015, a copy of the foregoing Complaint shall

be served upon the following individuals as indicated below.

_Mark Hanna (LH)_

Mark Hanna
Murphy Anderson PLLC
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: 202-223-2620
Fax: 202-223-8651
*mhanna@murphypllc.com*

**Relator's Counsel - via regular U.S. Mail**:

Ann Lugbill (DC Bar No. 462850)
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH  45219
Phone:  513-784-1280
Fax: 877-784-1449
*alugbill@murphypllc.com*

Phillip A. Ciano
Andy Goldwasser
Ciano & Goldwasser, LLP
1610 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115-1093
Phone: (216) 658-9900
Fax: (216) 658-9920
*asg@c-g-law.com*
*pac@c-g-law.com*

**U.S. Department of Justice - via Certified Mail, Return Receipt:**

Loretta E. Lynch
Attorney General of the United States
Office of the Attorney General, Civil
Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Vincent H. Cohen, Jr.
Acting United States Attorney
Attn: Beverly Russell and Keith Morgan
Assistant U.S. Attorneys
Judiciary Center
555 Fourth Street, NW
Washington, DC 20530

**U.S. Department of Justice - via Hand Delivery:**

Arnold M. Auerhan
U.S. Department of Justice, Civil Division
Patrick Henry Building
601 D Street, NW, Room 9020
Washington, DC 20004


**Counsel for the States - via Certified Mail, Return Receipt, within 5 days after filing of the Complaint, together with a copy of Relator's Disclosure:**

Kamala D. Harris
California Attorney General
1300 "I" Street, Suite 1740
Sacramento, CA 95814-2919

John Jay Hoffman
New Jersey Attorney General (acting)
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625